Good afternoon, Your Honor, Susan Lin on behalf of Appellant Mr. Jackson. I'd like to reserve five minutes for rebuttal if I could. Yes, you may. Thank you. This is a case in which the police officer testified under oath on multiple occasions that he had no reason to believe that the occupants of the car were armed and dangerous. Given that, and given the objective facts that are on the record, the intrusiveness of the seizure and then the frisk of Mr. Jackson was unreasonable under the Fourth Amendment. But he also testified that the reason he engaged in the precautionary measures he did was out of concern for officer safety. How should we think about those things together? The generic phrase, the generic assertion for officer safety is insufficient without articulable facts that are specific to the individuals being stopped to support that conclusion for officer safety. But don't we have a number of facts here? You know, he, in testimony that's credited by the court, believed that they were engaged in, you know, evasion and fleeing from the police in the way that they were driving. That it's, you know, one, two o'clock in the morning, that it's a high crime area, that he runs the, you know, the registration and plates and has at least a suspicion that it's a stolen vehicle. I mean, if we put all of those things together, along with the deference that we, you know, need to accord in a situation where it's a vehicle stop and the arrest hasn't been effectuated, where we've got a number of cases tell us officer safety is, you know, often at risk. Why isn't it enough? So in this case, the deference that I think that the court needs to be considering is deference to an officer's experience and their conclusions. And in this case, the officer flat out testified. He had concluded that he had no reason to believe that the occupants were armed and dangerous. The idea that vehicle stops are inherently more dangerous is out there and it is accurate. But the court has already made a balance. In the cases of vehicle stops, in order to consider or take account for the dangerousness of them, yes, officers can automatically ask the occupants and the driver to step out because of the dangerousness of vehicle stops. Yet even with vehicle stops, there still has to be an articulable, reasonable suspicion that the occupants are actually armed and dangerous. In this case, with the evasion. So are there any cases that hold dangerousness is enough for a pat down or a frisk? I think the cases are pretty consistent that armed and dangerousness is enough for a pat down. I think that's the standard law. You can never separate them is what I'm asking. Are there any cases that simply say dangerousness is enough? I have not seen cases that have actually articulated the difference between armed and dangerous. They seem to discuss it jointly together. And I would say that if there was reason to believe that somebody, because they were so high on PCP, for example, was dangerous, that would likely be sufficient to justify a pat down. I just don't know that you can necessarily separate the armed and dangerousness, at least in this case. And I don't think it's necessary in this case, because there was not even indicia of dangerousness, according to the officer himself. With regards to the totality of the circumstances that Judge Crass was referring to, the evasion, the time, the unregistered plates, I would say that those factors certainly provide reasonable suspicion of criminal activity. But the question for the court is whether or not those factors provide reasonable suspicion of armed and dangerousness. I would submit no. In cases where courts have found that there is indicia or reason to believe that the occupants are dangerous and armed are cases where there have been reports of violent crime, reports of a shooting, reports of somebody waving a gun around or being in possession of a gun. Even if there is suspicion of drug trafficking, there have been courts that say that drug trafficking is often associated with guns, so there's reasons to do a pat down. None of that was present here. Can we take account of the circumstance of them making that turn into this dark, dead-end lot with three individuals in the car, one officer with a trainee who can't engage, and that escalating the danger? So once that car turned, which, by the way, the Nissan did signal its left turn in order to turn into the side street, which counters the idea that the Nissan was evading. But anyway, with regards to the officer being outnumbered, what Officer McCauley here did at start was exactly what he should have done. He told the people in the car to remain in the car to keep their arms visible, and then he called for backup. And he only ordered them out of the car at gunpoint after backup officers had arrived. So at the point that the officer engaged in the actions that we submit are overly intrusive here, he was no longer outnumbered. He testified that he waited for two or three backup units. We know from the video that there were at least four individuals in the video. The judge, in his opinion, mentions five individuals. And it's not in the record, but the discovery did mention even more officers. But the bottom line is the officer was Officer McCauley was no longer outnumbered. At the time, he engaged in the steps that we submit are overly intrusive and unreasonable under the Fourth Amendment, namely ordering people out at gunpoint, having them walk backwards, having them kneel, having them cuffed, having them frisked. To be clear, you agree that Officer McCauley's conduct, including having pulling a firearm while waiting for backup, was reasonable. Up to that point, I have no argument with what Officer McCauley did. I think once backup arrived, his justification for engaging in those things ended. He was not outnumbered, and there was no specific indicia of armed and dangerousness for the individuals in the car. Okay. And when you – I just want to understand your argument. Is the analysis regarding armed and dangerousness, my understanding is you are saying that's a separate assessment for the frisk. But your argument as far as walking backward, hands up, gunpoint is a different reasonableness, that the frisk has to be armed and dangerousness, but the other portion of it is dangerousness in the context of a traffic stop. I'm not sure that I would actually say that they were different. So it's clear in terms of a frisk. In terms of a frisk in particular, there has to be reasonable suspicion of armed and dangerousness. In terms of the manner of seizure as a whole, the courts have said that it's a totality of circumstances. Are all of these actions reasonable given the circumstances? Is that level of intrusiveness reasonable given the circumstances? Most of the cases have boiled down to whether or not the officers had to take those actions because there was a belief that the people may flee or the people may be dangerous or the people may be armed. And in this case, essentially, it boils down to the same question. If the officer had reason to believe that they were armed and dangerous, then I think the manner of the seizure would have to be okay. But in this case, we're saying he did not have reason to believe that they were armed and dangerous. So the test ends up being the same for both in this case. I'm not willing to say that there's no case out there where the manner of seizure would be okay given other factors that are not necessarily because of armed and dangerousness. But here, there was nothing else. There was nothing. And here, it's based upon what the officers knew. And maybe if they seemed nervous or did something to give the officers reason to believe that maybe they did have a firearm or there was more to it than just a vehicle stoppage. But here, as you say, there's really not a lot there in terms of what they did know. Right. There are certainly other cases where the courts talk about seeing furtive – the officers talk about seeing furtive movements, seeing somebody reach towards the center console or reach as if they're putting something under a seat or going through their waistband. But McAuley, Officer McAuley, in his testimony, was clear that as soon as he started issuing orders, the occupants were compliant. The hands were visible. He denied seeing any furtive movements. There are no such actions on the part of the occupants that would justify the subsequent manner of which they were taken out of the car, handcuffed, frisked. And what about risk of flight? I mean, he tells them in the audio that accompanies that video that he's arresting them for fleeing and evasion. So it was undisputed below in the district court that the officer had never turned on his overhead lights or sirens. So the evasion was an inference or even some would say speculation on the part of the officer that they were – that the driver was going at the rate he was going and making the turns that he was turning because he knew that there was a police officer car behind him. But the district court made a credibility finding on that point, right? That's a finding by the court, and don't we have to defer to that? So the district court's opinion is very distinct. It has two parts. It has a part that's a finding of fact and has a part that's the discussions. In the finding of fact, it does talk about the turns that the car made. The court – the district court did not use the word evasion in its findings of facts. The district court then in its discussion, which I do not think our findings of facts which the court has to defer to, but the district court in its discussion portion concluded that Officer McCauley was reasonable in believing that the car had invaded him. But that wasn't actually, I submit, a factual finding that the court made. It is interesting to me that Officer McCauley admitted that he did not issue any ticket for speeding. He did not issue any citation or ticket for evasion, that he was not able to say how fast the car was going. And again, I point out that the car put on its turn signal and turning. It just seems like a very unusual thing for a driver to do if he's trying to run away from a police officer that's behind him. If he had testified that he believed that they were armed and dangerous, would you still be making this claim, the Fourth Amendment arguments as to the reasonableness of the stop? I would because I do think – it would be more difficult for me to make this argument. I would still be making the argument because we still have these facts on the record indicating a lack of any articulable facts, indicating armed and dangerousness, specifically the lack of any reports of crimes, et cetera, et cetera, like no visual seeing of anything being thrown out the window or anything being hidden. All of that still holds regardless of the officer's testimony. Our argument here today is stronger because based on the facts that were presented at the evidentiary hearing, plus the officer's own conclusion, there is no basis to believe that the occupants were armed or dangerous. I want to ask about your frisk argument because before the district court, you were arguing the totality of circumstances. And, you know, when that testimony came out about there being a frisk, you sort of incorporated that into the arguments that you were making to the court. Here you've broken that out into a different argument in your brief. That is a standalone argument that the frisk violated the Fourth Amendment itself. That wasn't presented as a distinct argument to the district court. Is it forfeited? I would submit not. Because the frisk was discussed in front of the district court and because the district court addressed the frisk in its opinion, this argument has been preserved. This court has made clear that parties can rephrase their arguments before the court of appeals as long as they raised all the issues before the district court. The district court specifically asked about the frisk. And the citation, I believe, is at Appendix Courts Indulgence Place 358. But the district court specifically asked about the pat down. And in response to the district court's questioning, counsel for Mr. Jackson, and it was me below, specifically said that the reason a pat down was permitted in Pennsylvania versus MIMS is because the officer saw a bulge. They saw something indicating that the driver could be armed or dangerous, and that was not present here. So the issue, while we may have expanded upon it in the court of appeals, was presented to the district court. And the district court did address it in its opinion. Whether it is addressed as part of a total number of circumstances or if it's addressed alone doesn't really matter given that the analysis is the same. The question before the court is the same. Was there indicia that the people were armed and dangerous? It all boils down to that. And the frisk was a bit of a surprise anyway. It only came out in the district court suppression hearing that there was contention that the frisk was implicated. That's correct. Prior to Deputy Baker's testimony in the federal district court, it was not clear from the papers or anything that happened before that a frisk had actually occurred. Just out of curiosity, if we were to reverse, your client would get the benefit of that. He preserved his option as part of the plea. What happens vis-a-vis, just out of curiosity, for the driver and the passenger in terms of their ability to take advantage of any of that? I mean, it's not before us, but I'm just curious. So the driver, I believe, also entered a guilty plea that preserved his right to appeal this issue. And he did appeal this issue. He just ceded all his time to me, for which I'm very grateful. The front seat passenger pled guilty. And I believe that it was a guilty plea that he did not file any motion to suppress in the district court. And I do not believe that it was a guilty plea that preserved any right to appeal or revisit anything. Even if we were to find there were no reasonable suspicion, for instance, for the frisk, in order to suppress anything other than the magazine, wouldn't there have to be a finding that everything else was a fruit? So I believe that it is the facts that make it fruit, I think, are undisputed. I think that both parties in their briefs characterized the events as follows. There was the frisk of Mr. Jackson that revealed the magazine. That was followed by questioning of Mr. Jackson, who said there was a gun in the rear seat cup holder, which led to Deputy Baker going inside of the car, getting the gun from inside the car, smelling marijuana. Both the recovery of the gun and the marijuana led to the search of the trunk, where the evidence was with the masks and the other gun and the gloves and stuff. And then that led to the phones. So it's facts on the record. It's also on the record, if you watch the video, that simultaneous to the frisk, two officers are looking inside the car where the firearm is located. But there's no testimony there. And typically, if it's more than the magazine, you have to have a finding of a fruit and also a finding that there's no independent source or other intervening event that breaks the chain. So if we were to find there's no reasonable suspicion, is that a remand? Or is there enough in the record for us to make those findings on our own? So I think that when the court asks about independent source or intervening source, in a way you're asking about is there a reason not to apply the exclusionary rule. And I do believe that the burden is on the government to raise the possibility of inevitable discovery or intervening source or some sort of attenuation that purges the taint. And the government did not address that in their appellate briefs. There is no evidence to support that in the record below. There's no evidence, there's no testimony that the gun was in plain view or could be viewed from the outside of the car, for example. That just wasn't addressed. And so given that the burden is on the government to raise times when the exclusionary rule should not apply, and given that they did not raise it, I would submit that that is waived. I also think that this court has previously said, and I believe it may have been Kithcart, I forget if it was the first opinion or the second opinion, that it's generally disfavored when remanding issues. It's generally disfavored to allow the government to reopen the record, especially in cases of suppression motions when the burden is originally on the government in the first place. I guess the reason I'm asking is the context of your Frisk argument, focusing again on your Frisk argument, is that it is arguable, and you yourself said at the suppression hearing in argument, that you had been unaware that the Frisk was after handcuffing and that it preceded the answer about the magazine. And therefore, you had not raised that specific Frisk argument below. That seems to be perhaps a unique factor why the district court only addressed the Frisk really in five words and really addressed your arrest argument, and why there was no discussion of fruit. There are multiple Supreme Court cases, even when the government has the burden of proving independent source or intervening events or consent, where the Supreme Court has sent it back to the district court for fact-finding, even when it is, if you wanted to say, an affirmative issue that the government had to raise. So I think the context of sort of this Frisk argument arising anew in the hearing, is that a burden that the government had given that it was raised at the hearing and no post-argument briefing done? I have a couple answers to that. The first one is, if the court's inclined to remand, there's a difference between remanding for a court to consider something and remanding for the district court to reopen the record. And I certainly think that the case law disfavors the reopening of the record for new testimony. Second, I would say that the concept of inevitable discovery or being able to see the gun from outside of the car is something that would have been raised regardless of when the Frisk happened, or should have been raised, could have been raised. Let me put it that way. Could have been raised regardless of when the Frisk happened. The argument presented in the briefing prior to Deputy Baker's testimony was that the taking of the individuals out of the car in the manner in which they were taken out of the car was the unlawful event, and everything after that had to be suppressed. If the government could have raised at that point that taking out of the car, the occupants out of the car, was permissible under MIMS, and then the gun was in plain view. But they did not raise that, and they did not present any testimony of that or any evidence of that. So therefore, I don't think that the timing of the Frisk or the argument about the Frisk actually changed the situation that was before the government and the availability or even the desirability of making some sort of inevitable discovery or alternative source, independent source argument. So I do think it's waived. My time is up. I will step back. Actually, I've got just one other thing I wanted to ask you about. There's arguments about this being a de facto arrest versus unreasonable execution of the stop. Does it matter? I recognize that this Court in Johnson distinguished the two things. I'm not really certain that there is a difference between finding that an investigatory detention has turned into a de facto arrest versus simply finding that it was unreasonable in its scope and intrusiveness under the Fourth Amendment. The test is the same. It's reasonableness under the totality of the circumstances. I don't think it matters. And in your view, what would have been reasonable given, you know, it's a dark alley, 2 in the morning, the other officers show up. At that point, should an officer walk up to the window? So I think other officers showed up. The officer has several options, Macaulay, that is, several options. He can go up to the window and talk to the driver through the window. He can ask everybody to step out of the car and talk to people while they're outside of the car. He can engage in the typical questions for a traffic stop, license, please, registration, please, where you headed. He can even ask, I've seen you driving around here. What are you up to? He can ask all of those things without continuing to hold them at gunpoint, making them walk backwards, making them kneel, handcuffing them, frisking them. All of those questions would have been in the bounds of a reasonable investigatory detention based on what he had seen. All right. We'll hear from you in a little. Thank you. Good afternoon, Your Honors. Kevin Jane on behalf of the United States. Your Honors, Ms. Lynn's argument, it is within the bounds of zealous advocacy, but I would say that from the government's perspective that she couldn't be more dead wrong on the facts. This was a very dangerous situation that was presented to an 11-year veteran of the police department in Collingdale who had done 800 to 1,000 vehicle stops. But he said it wasn't dangerous. We're looking at his own testimony. He says nothing that would indicate that either he felt there was danger or objectively that there was danger. What do we have? We have it's late at night and it's in a high crime area. Well, guess what? That's, I'd say, 80% of police stops of this kind are probably late at night. And he has the evidence regarding the vehicle, but that's standard. It's a vehicle stop. What else do we have? They're compliant. They put their arms up. He gets back up. What do we have? Yes, Your Honor. So to answer the first part of your question, I think there's some confusion about how to evaluate Officer McCauley's testimony. First of all, the record is mixed about that. Earlier on direct by the government, Officer McCauley testified that the reason that he employs that type of procedure where he brings backups is for officer safety and that he was concerned about these individuals that night. He does say in response to a series of rapid-fire questions on cross-examination that he did not think that they were armed and dangerous. But what's important is, as this Court has said and the Supreme Court has said, and I'll cite to the court United States v. Goodwich, that the subjective intent of the officer on the legal test has no bearing on today. It doesn't matter what the timid officer who would want to frisk every person or the John Wayne or Caitlin Clark of officers who would charge in and risk their safety every time. What matters is the objective factors in the case. And part of that is the objective inferences that the officer makes in their training and experience. So what you have here, and let's go back to the beginning, an unregistered, untagged, meaning the tag cannot be associated with that vehicle. So what does that mean to the officer? This is very important in law enforcement. A stolen car, the reasonable belief or the reasonable inference that this car was stolen, which is a very serious crime and is the type of crime. Well, I don't know if it's an inference. It occurs to you. But it's not more than a hunch. It's not more than a hunch, is it? It is when you take it. So, Your Honor, what you're suggesting is that sort of divide-and-conquer approach which has been rejected by Your Honor and this Court and the Supreme Court. When you take all these things together, the potential of the officer goes, stolen car. I'm going to get behind this car and see what it does. Sped off, as the District Court found, under a clearly erroneous standard, the District Court found that this car sped off and that there was a reasonable belief that this person was evading that first time. Officer is confused, sends out a bolo, I'm looking for this car. An hour later at 2 a.m., reacquires this car, makes a U-turn. What does the car do? As soon as the car, as the officer's car comes over the hill, it darts to the left. Yeah, with a turn signal on. With a turn signal. Yes, Your Honor. You've got to remember that the individual in the car is also trying to get away. So if he thinks, I don't know who this officer is, it would be very easy for them to do this signal as they make the left. Because it worked before. He was able to get away before. All right, but let's get to where the car now has turned left. And they've all got their arms up. We watched the video. They've got their arms up. Back up comes. Do they ask, is any of you Calvin Johnson, Jr., which is the name that came up on the registration? Doesn't even ask, who are you? Does anybody here own this car or license and registration? Never even does what you would do with a vehicle stop. And, you know, help me with that. So if we could just go back a little bit, Your Honor. So this officer, 11 years veteran, he knew when that car made a left. We're saying it's objective again. Objective. Objective. But the officer's reasonable inference under the officer's training experience, the court can consider the reasonable inference. It's not the legal test whether or not, like I said on cross-exam, he says. But he didn't testify about his experience, about what his experience taught him about this. He did, Your Honor. What he said is when that car made the left, he knew that neighborhood so well. It was a business that had been closed for three months in a closed restaurant. And he had no business being in that alleyway. No business. That was objected to. But there's also an apartment building, and we don't know whether they knew where they were going. Maybe they were just turning, and maybe they thought it was Johnson Street where they were going, and it wasn't. Right. But, again, Your Honor, we have to start, and we have to put these facts together. Right. Okay. We always – it's easy to take any particular fact and say that it might be a reasonable explanation. By the way, no evidence on the record of that. Just cross-examination where, hey, this could have been this, this could have been that. But what's important, when you start at the beginning and start to put these things together in the shoes of the officer who is the one at 2 a.m. in a high-crime neighborhood, thinks that the car may be stolen, that he reasonably believes that this car had evaded him twice, alarm bells are ringing all over the place for this officer. So what Your Honor might be suggesting – I don't think you're suggesting, but just sort of teasing out of government our view – it is a very dangerous situation. And to micromanage the officers in that moment maybe he should be asking a question. Maybe he should, from behind, walk up to the window rather than doing what he did. Well, I'm just saying what a reasonable officer would do in those circumstances. Yes, Your Honor. I understand your question. But I think what this gets at is the court has to draw lines. I understand that. But if we look at the case law, we have to be very careful when we talk about vehicle stops and officer safety. If you really look at the video, it's actually a very professional stop where the officer is concerned for their safety, and they bring these individuals out one by one, and they do a safety frisk on them. You say in your brief, because the officers had a reasonable belief that their defendants were dangerous, ordering the defendants out of the car, performing a safety frisk, and temporarily detaining them were permissible actions. Yes, Your Honor. But get to the reasonable belief that they were dangerous. Right. So, Your Honor, again, you have to look at all these things together. From the very beginning, the officer believes potentially stolen car, evasion the first time. Begins to look for these individuals over the course of an hour. Reacquires the car. Reasonably believes that the car, and this is under a clearly erroneous standard, again tries to evade the officer. Knows that they're going to a place where there is probably nothing around there that they should be in. They could bail out of the car, so there could be flight once he gets there. And so when you put all of these things together, stolen vehicle, which is a serious crime, the high crime neighborhood, the evasion that happens, and these are all part of that traditional test. When you look back at the traditional factors, which is non-exhaustive, evasion is on there. Time of day, 2 a.m. to dead of night. The officer's training and experience in how they react and make reasonable inference in the information that's given. All of these factors are met here. But Ms. Lynn has taken a nuanced position that everything that Officer McAuley did up to the point of the other officers arriving was within the bounds of reason. The real argument is now that you've got all these other officers present and they're arriving on a scene with the three individuals with their arms up and out the window. At that point, they don't present a risk of danger. And how do you respond, not with all of the circumstances leading up to the stop, but once the officers arrive on the scene, how is what follows from there reasonable? Yes, Your Honor. So first I will say that this is the first time, and I might be wrong about this, but I think it's the first time I've heard this concession, that everything up to that moment is permissible. So I haven't really grappled with that. I didn't expect Ms. Lynn to say that. But under Pennsylvania v. MIMS and Bonner, in a long number of cases, the officers are permitted to exercise reasonable superintendence over the car. And what that means is over the car, the driver, and its passengers. And the fact that any individual in the car, the driver put his hands up, the person in the back, who also happens to have a gun that's sitting in the pocket of the rear, and the other passenger in the front may be complying at that moment, doesn't mean that there still isn't danger that's presented reasonably in the mind of these officers. But there has to be something. I mean, in Bonner, the passenger fled. In MIMS, there was a bulge. In other cases, someone was acting nervous or noncompliant. And we don't have an aha. And if we did, we'd probably say, okay, we get it. But there's nothing here that would lead you objectively to say this could be armed and dangerous. Your Honor, again, this gets back to the case law. What the Supreme Court has instructed, and this Court has said over and over, is we should not be engaging in the second guessing of these officers, trying to figure out what an officer with 11 years who thinks a car might be stolen and the person is evading, that they then get to decide who's the person that gets to approach that car. Well, we get back to the objective standard. And all the cases you cite, Arvizu, Bonner, Brignone, Brown, Cohen, Elston, Foster, Foster, Good, they all have something. Defendant smelled a PCP. Informant told officer illegal gun sale. 9-11 call, blah, blah, blah. So, I mean, they all have something. And I'm just looking for the objective fact that would allow us to say this is an aha moment. Of course it's okay. Yes, Your Honor. So I think if you look deeper in the case law, first of all, we don't have a case on the other side that says that these particular facts are ones where the court should find that the terror stop wasn't proper. But I would point out there are many, many cases that on very scant facts that a terror stop was permitted. One case is United States v. Edwards, which is cited in the brief. It's a 1995 published opinion. Yeah, an eyewitness reported at a corner shooting at passing cars, providing a physical description information about where he was going next. I mean, there was something there. And I might be getting my cases confused, but I think Edwards is a bank fraudster. There was a bolo out for a bank fraudster who left a bank, and the officers were permitted to block that car and take that person out of the car and do a tariff risk. No, not bank robbery. Bank fraud, Your Honor. So not something that isn't dangerous. There's also the Supreme Court, if you go back to Terry, let's go all the way back to the beginning, 1968. The Terry case had to do with a person walking back and forth in front of a store. And the Supreme Court said that because the officer in his training experience, the reasonable inference was that they could approach this person that they thought may be casing the joint and do a tariff risk. That's where Terry comes from. And you can stop him, and you balance the same thing in MIMS. Can you even ask them to get out of the car? And in MIMS, they made the amazing discussion, yes, you can. And even Thurgood Marshall said, well, I don't know whether I like that intrusion. But Terry involves a minimal invasion versus what the police did. So I think Terry is a little bit different. Mr. Jankowski. Oh, I'm sorry. No, go ahead. Mr. Jankowski, there does seem to me to be a difference in the case law between the reasonableness of actions in the context of a traffic stop, where there are multiple dangers that are possibly being addressed. Flight, physical assault without a weapon, assault with a weapon. For a frisk, the safety measure is a pat down, and the safety concern being addressed is possession of a weapon. The point where Mr. Jackson was frisked, he was already handcuffed, and there were multiple officers on scene. What factors can you point to that demonstrate a reasonable belief that he was armed and dangerous? My survey of the case law seems to reflect that. An indication that someone is armed is, you know, to Judge Rendell's point, usually a bulge, furtive movements, evidence in the record that the crime of suspicion is associated with weapons possession. What in the record can you point us to that reflects a reasonable suspicion that Mr. Jackson was armed and dangerous, given the fact that he was, by the time he was frisked, kneeling and in handcuffs? Yes, Your Honor. So I would say that the armed and dangerous language comes from the Supreme Court, but I think what happens is those words have really been collapsed in the case law, including by the Supreme Court. So when we really talk about this, it's about dangerousness, and there are... I looked for cases that really just reflect dangerousness and not specific indicia of weapons. I didn't find any. What can you point to? Well, Your Honor, in this case, the officer had a... believed that the vehicle registration being unassociated with a car and also expired may have been stolen. And for this officer, he talked about a felony stop. Stolen vehicles is a serious crime. Stolen vehicles are associated with violent crimes, dangerousness like drugs. But can you point to that testimony or something in the record that reflects that? Because, again, the cases that I've surveyed, there's something in the record that actually puts into evidence a connection between the offense and the association with weapons. I didn't see anything about an association of weapons, in particular, with stolen vehicles. And I understand you're saying it's not necessarily weapons, but I'm waiting to hear for a case that stands for the proposition, because all the cases I've seen, there's some sort of indication of a weapon, whether it be, again, bulge, furtive movements, hands in the pockets, association between the crime and weapons. Yes, Your Honor. So I'm looking for both case law and evidence in the record. So I think the best case I can give you, or one case I can give you, is Arizona v. Johnson, which is a Supreme Court case that talks about the officers come up to a car, and they see a guy with a blue bandana on. And he says, I've been to jail. Guess what? He gets frisked because they believe that that might be someone who would be associated with a gang membership. Now, there has to be an inference made. Is this African-American male that has a blue bandana on might be associated with the Crips, which is a gang, which gangs invade gangs and violence. You can see how there's a long inference that had to be made, even by the Supreme Court in Arizona v. Johnson. The furtive movement case is, Your Honor, there's a case out of this. It's an unpublished case out of this. It's out of Pittsburgh, Your Honor. Judge McKee wrote the opinion, and the name's escaping me. But essentially, the officers come to the car. The guy's in his center console before they get there, when you would get your license out. They go away, and he goes into his center console one more time. Right, but that suggests possible access to a weapon. So I'm just saying you seem to be saying general dangerousness is enough. So that's what I'm looking for, a case that doesn't have, you know, furtive movements, bulges, associations with a crime, just, you know, a general belief the same way in the context of a traffic stop. There's sort of there's a concern for danger that's more than weapons. You seem to be saying that general dangerousness is enough for a frisk, and I'm looking for a case that says, is there a case that you can cite? So I don't have a case just like this. I also don't have a case that's just like this where any court, any court anywhere, has done what Ms. Lynn suggests under these facts with. And again, we're getting into this divide and conquer analysis. Let's take one factor like whether or not what was the crime, reasonable crime, or criminal activity that the officer might be looking into here. It was potential stolen car. Again, you have to take that in context, and you have to string it together with all the facts that we have here, the traditional factors, the time of day, the high crime neighborhood, the evasive behavior. Evasive behavior, why is this car, if he thinks it might be stolen, trying to get away? And why is it going back to this place that this officer knows well that's near a chain link fence and some woods and two closed businesses? And all of these things, when you put these things together, particularly where you give deference to the officer in a vehicle stop in this dangerous situation, all these things together, in our view, it's very obvious that the reasonable suspicion exists. And it doesn't dissipate. It's not a suicide pact, as the Supreme Court has said under the Fourth Amendment, where officers have to choose which officer gets to approach the car, which, by the way, has a gun inside of it in the back in the rear cup holder on Mr. Jackson himself. Who's the person that's going to approach the car? And what person, what prosecutor or member of the public or even your honors are going to tell the officers or going to micromanage them in that situation when they are concerned with their safety and there are reasonable facts at the lowest threshold under the Fourth Amendment, reasonable suspicion. That's why the cases don't exist because all it has to be is more than a hunch for them, less than probable cause, to be able to make that determination that he's concerned for his safety. He's concerned also for the safety of the occupants of the car. And it doesn't matter if they brought 100 officers. Who's the person that's going to walk up to that car and question those individuals when they think that there's a concern for their safety at the lowest threshold under the Fourth Amendment? And that sort of gets to the rub of what we're really talking about here, is anybody sort of second-guessing an experienced officer with this training in this type of neighborhood at this time of day, thinking it's evaded, maybe stolen, all those things together. It certainly was reasonable for him to professionally bring those individuals out of the car and do a Terry Frist on those individuals where the gun clip was found. You get to the gun, marijuana smell emanating. There's testimony from not only Officer Baker about that, but also Officer O'Donnell who smelled fresh marijuana. They're getting in that car anyway. The car's not going to be driven that night. It's untagged. It's unregistered, broken taillight. The car's not going anywhere that night. So is everything other than the magazine a fruit of the poisonous tree? So, Your Honor, Mr. Jackson doesn't have standing to be able to bring that claim. Mr. Jackson relies on Brendlin, Supreme Court case, and Mosley for the proposition that somehow he can get around the general rule in Illinois v. Rakes that standing would not exist here because the evidence that was found in the trunk of the car, he doesn't have a reasonable expectation of privacy in that evidence. But the trunk search was the fruit of them, the magazine, the frisk, the magazine. So it follows from there. You don't need an independent ownership of the trunk in order to find that it is a fruit. Not necessarily, Your Honor. I think for the reasons identified, the government, Ms. Lynn may have missed this, but the government did make the inevitable discovery argument in its briefing, and it was discussed before the district court. The district court didn't need to reach that issue. That in the brief before us? It is referenced in the brief. So the government's response is to the issues that were presented by the appellant. So we respond to the appellant. But it has to be raised on appeal to us. So the overall issue is whether or not the Fourth Amendment was violated. The government made that argument to the district court. The district court did not address it in its district court opinion. Now on appeal, Ms. Lynn has teed this up as a Terry issue. The government has raised this issue, but it hasn't been addressed. So I think at best this would either be affirmed for the reasons that are in the record. Typically this court does not reverse for reasons in the record, but it does affirm for reasons in the record, or send it back to the district court if Your Honor swore to find something improper about the Terry first. But we can't open up, we wouldn't open up the record, allow the district court to open the record again. I don't think you should give the district court that instruction, and it would be something that the district court would have to contemplate, but I don't think there would necessarily be any reason to reopen the record. Isn't it your burden to raise on appeal alternative grounds for affirming? The issue is whether or not the Fourth Amendment was violated. And the government did present in its briefing that the manner in which it was done was proper, that the Terry Frisk was proper, and that it wasn't teed up in terms of the briefing, in terms of a legal analysis, but that the marijuana was detected by both Deputy Baker and also Officer McDonald, and they were going to get into the car anyhow, Your Honor. So I think at best, this would be the type of case that would need to be remanded for the district court to decide what to do next in this case. What about what comes across in the record and sounds almost like a regular policy and practice of if somebody runs stop signs to call in a felony, quote, felony stop, which the officers all seem to understand means that there's actually been a serious violent crime, like a dangerous crime that's been committed. So they show up with their firearms out. And then doing a frisk as a regular practice before putting someone in the backseat of a car to make sure that the officer doesn't get stuck with needles or anything sharp. I mean, that's not a basis for conducting a pat-down, is it? So if I could take your first question, Your Honor, regarding the felony stop. The officer explained that that is a term of art that the officers use to alert everybody to know what it means is to bring all the backup to the place. And there's a commanding officer, in this case, Officer McCauley, who then will direct them. So really what it's signaling is bring all the resources quickly, and then the officer on scene would be the one that would inform the other officers. And that's exactly what happened here. So they used the word felony stop. They've got to have an easy moniker. And again, we're second-guessing the officers, but an easy moniker for them to quickly get resources. And so that's what this particular officer used. It doesn't mean necessarily because he said this was a detention. He didn't call it an arrest. Officer McCauley says that on the record. He says, I used felony stop because that's the terminology we use. We bring all the resources, and then Officer McCauley then directs them once they get there. In terms of the frisk itself, Your Honor, under the collective knowledge doctrine, what matters is whether or not the actions of the officers collectively were reasonable at the moment that Terry Frisk happened. And it's irrelevant what Deputy Baker, in terms of his personal preferences, are about doing a pat-down search, whether he asks somebody if there's needles. It makes perfect sense to me. In terms of a safety question, you don't want to get stuck with a needle, but really irrelevant for purposes. All that matters is what do the collective officers know, and under the Fourth Amendment, whether it was reasonable for the Terry Frisk to happen, which we believe it was. Again, giving deference and not second-guessing the officers in that Terry Frisk was proper. But when you say reasonable, your argument is that it's reasonable because of the other indicia of dangerousness that we've been talking about. The government's not taking the position that it's reasonable out of concern that somebody might have something sharp to do a pat-down whenever you have a stop. That was in our area, Your Honor. Unless you have any questions, we ask that the court affirm the district court's suggestion. Thank you. Your Honors, there are certain points that I'd like to address if I could. I'm going to start with inevitable discovery, talk about the odor of marijuana, and then I'd like to talk about the whole stolen car idea. Starting with inevitable discovery, the government did raise in its response brief filed before the district court the concept of inevitable discovery, and they based it on the idea that there would have been an inventory search that would have gotten to this stuff in the trunk anyway. The problem is they presented no evidence at the hearing that this is the kind of stop that would have resulted in the impoundment of the car and then a subsequent inventory search. There is no evidence in front of the district court, no testimony that driving with a broken taillight and an unregistered tag or expired tag would have automatically led to the impounding or the towing of the car. And absent that evidence, there's just no basis to find inevitable discovery, and they certainly had notice that such evidence may be necessary because they raised it themselves in their response before the district court. So absent that, absent evidence supporting the concept of an inventory search, absent the raising of it in the appellate briefs, I think it's both waived and no evidence supports it. With regard to the odor of marijuana, government counsel did refer to testimony specifically by Officer O'Donnell that the odor of marijuana was emanating from the car. Before the district court, the idea of the odor of marijuana was hotly contested. I think it was apparent from the transcript that the jars were brought in. There was no actual marijuana found in the car. There was residue found in a jar and in vials that were in other bags that were in a nap snack that was in the trunk. So the idea that there was an odor of fresh marijuana was something that the parties were disputing. The district court judge in its findings of fact did not mention O'Donnell at all. Deputy Baker clearly testified that he smelled marijuana when he went into the rear compartment, the passenger compartment of the car. The district court in its findings of fact wrote that Deputy Baker smelled marijuana when he went into the car to get the gun. So the idea that this court could affirm on the grounds that there was marijuana emanating from the car and the officers would have gone into the car anyway simply is not supported by the record. It's not supported by the district court's findings of fact. And that was a fact that was hotly contested. O'Donnell's testimony, he was impeached greatly with his testimony in the state court hearing because it was inconsistent. And I think that the district court's failure to cite to O'Donnell's testimony at all in its findings of fact is telling. And the district court's, once again, I just defer to the district court's finding that Baker, Deputy Baker, did not smell marijuana until entering the car. Well, and again, if odor of marijuana were to be a separate basis that the government is contending would be an inevitable discovery or independent perhaps if they had gone in to check if there was another passenger in the car and smelled it. That has not been raised on appeal. It was not raised on appeal, and therefore I would submit that that is waived. I would also, there was discussion about a stolen car or the possibility that the car was stolen. And I believe that Judge Rendell, you may have said that perhaps it was a hunch on the part of the officer. Even if we give them that hunch, I would point this court to the case of Green versus City and County of San Francisco out of the Ninth Circuit. In that case, officers had, through some sort of automated license reader, gotten a report that this particular car was stolen. And so they pulled that car over because it was stolen. While the idea of reasonable suspicion was contested, the Ninth Circuit wrote that even if the officers had reasonable suspicion that this car was stolen, that a stolen car in and of itself does not demonstrate that the driver of the car presented a danger to the officers. I would ask that the court find the same thing here, that there isn't even an automated license reader reporting that the car was stolen. There was an expired tag that perhaps did not match the car, but no report that the tag was stolen, no report that the car was stolen. Even if the officer had a hunch that the car was stolen, that does not support a reasonable suspicion that the occupants were armed or dangerous. I also have to say, since I have time, we've been using the phrase high crime area. I would point out that the language used before the district court was higher crime area. And the officer testified that that particular area of Collingdale had a higher crime rate than the other side of Collingdale, but there was no evidence regarding how often people were arrested for what type of crime. I think it was in Bonner, the district court found that evidence of 1.3 arrests per week did not constitute a high crime area. We don't even have that here. Higher crime does not equal high crime because it could just be one more arrest per month. Ms. Lane, you started out your argument pointing to Officer McAuley's testimony that he didn't believe that they were armed and dangerous. Do you agree that his subjective perception is irrelevant and what we're looking at is the perspective of a reasonable officer? We have to look at the perspective of the reasonable officer. However, this court also has stated that we defer to the experience and inference of experienced officers and the subjective testimony of an officer will certainly inform the objective analysis of the court. We know he was an 11-year, but I don't know what's in the record about his experience with car stops, et cetera. I believe that government counsel was correct. He said something about in totality over the course of his career making somewhere between 800 and 1,000 car stops. With that, I would actually ask the court to reverse the district court's ruling and remand with instructions to suppress the evidence. Thank you. Thank you, both counsel. You've persisted through a long morning and nonetheless had the stamina and astuteness to provide us very helpful answers through the morning. So much appreciated and we will take the case under advisement.